**HALPER SADEH LLP**
Zachary Halper, Esq.
186 Darwin Lane
North Brunswick, NJ 08902
Tel: (212) 763-0060
Fax: (646) 776-2600
Email: zhalper@halpersadeh.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAVID GATTO JR.,<br><br>  Plaintiff,<br><br>  v.<br><br>KNOLL, INC., ANDREW B. COGAN, ROBERTO ARDAGNA, DANIEL W. DIENST, STEPHEN F. FISHER, JEFFREY A. HARRIS, JEFFREY HENDERSON, RON KASS, CHRISTOPHER G. KENNEDY, JOHN F. MAYPOLE, SARAH E. NASH, and STEPHANIE STAHL,<br><br>  Defendants. | Case No:<br><br><br><br>**COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff David Gatto Jr. ("Plaintiff"), by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys.

## NATURE OF THE ACTION

1. This is an action against Knoll, Inc. ("Knoll" or the "Company") and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and

1

78t(a), and Rule 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.14a-9, in connection with the proposed acquisition (the "Proposed Transaction") of Knoll by Herman Miller, Inc. ("Herman Miller") and Heat Merger Sub Inc. ("Merger Sub"), a wholly owned subsidiary of Herman Miller.

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and 78t(a)) and Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R. § 240.14a-9).

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as a substantial portion of the transactions and wrongs complained of herein had an effect in this District, the alleged misstatements entered and the subsequent damages occurred in this District, and the Company has operations in this District.

5. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6. Plaintiff is, and has been at all relevant times hereto, an owner of Knoll common stock.

7. Defendant Knoll, together with its subsidiaries, designs, manufactures, markets, and sells commercial and residential furniture, accessories, and coverings for the workplace and

residential markets in the United States, Canada, Europe, and internationally. The Company is incorporated in Delaware. According to the Company, it maintains warehouse and distribution facilities in Clifton, New Jersey. The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol, "KNL."

8. Defendant Andrew B. Cogan ("Cogan") is Chief Executive Officer ("CEO") and Chairman of the Board of the Company.

9. Defendant Roberto Ardagna ("Ardagna") is a director of the Company.

10. Defendant Daniel W. Dienst ("Dienst") is a director of the Company.

11. Defendant Stephen F. Fisher ("Fisher") is a director of the Company.

12. Defendant Jeffrey A. Harris ("Harris") is a director of the Company.

13. Defendant Jeffrey Henderson ("Henderson") is a director of the Company.

14. Defendant Ron Kass ("Kass") is a director of the Company.

15. Defendant Christopher G. Kennedy ("Kennedy") is a director of the Company.

16. Defendant John F. Maypole ("Maypole) is a director of the Company.

17. Defendant Sarah E. Nash ("Nash) is a director of the Company.

18. Defendant Stephanie Stahl ("Stahl) is a director of the Company.

19. Defendants Cogan, Ardagna, Dienst, Fisher, Harris, Henderson, Kass, Kennedy, Maypole, Nash, and Stahl are collectively referred to herein as the "Individual Defendants."

20. Defendants Knoll and the Individual Defendants are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A. The Proposed Transaction

21. On April 19, 2021, Knoll and Herman Miller announced that they had entered into

3

a definitive agreement pursuant to which Herman Miller would acquire Knoll in a cash and stock transaction valued at $1.8 billion. Under the terms of the merger agreement, Knoll shareholders would receive $11.00 in cash and 0.32 shares of Herman Miller common stock for each share of Knoll common stock owned. The press release announcing the Proposed Transaction states, in pertinent part:

**Herman Miller and Knoll to Combine, Creating the Preeminent Leader in Modern Design, Catalyzing the Transformation of the Home and Office**

April 19, 2021 07:00 ET | Source: Knoll, Inc.

*Brings Together Complementary Portfolios of Exceptional Brands for Commercial and Residential Settings*

*Enhances Scale and Capabilities to Drive Growth and Profitability*

*Accelerates Digital Transformation*

*Drives Strong Financial Benefits Including $100 Million in Expected Run-Rate Cost Synergies Within Two Years of Closing*

*Supported by Shared Culture and Commitment to Design, Innovation, Operational Excellence and Sustainability*

*Companies to Host Conference Call and Webcast at 8:30 a.m. ET Today*

ZEELAND, Mich. and EAST GREENVILLE, Pa., April 19, 2021 (GLOBE NEWSWIRE) -- Herman Miller, Inc. (NASDAQ: MLHR) and Knoll Inc. (NYSE: KNL) today announced that they have entered into a definitive agreement under which Herman Miller will acquire Knoll in a cash and stock transaction valued at $1.8 billion. The transaction, which has been unanimously approved by the Boards of Directors of both companies, is expected to close by the end of the third quarter of calendar year 2021, subject to the satisfaction of closing conditions.

Under the terms of the agreement, Knoll shareholders will receive $11.00 in cash and 0.32 shares of Herman Miller common stock for each share of Knoll common stock they own. Based on Herman Miller's five-day volume weighted average price of $43.94 per share, the transaction terms imply a purchase price of $25.06 per share, representing a 45% premium to Knoll's closing share price on April 16, 2021. Upon completion of the transaction, Herman Miller shareholders will own approximately 78% of the combined company and Knoll shareholders will own approximately 22%.

In connection with the closing of the transaction, Herman Miller will purchase all of the outstanding shares of Knoll's preferred stock from Investindustrial VII L.P. ("Investindustrial") for a fixed cash consideration of $253 million, representing an equivalent price of $25.06 for each underlying share of Knoll common stock. Investindustrial has entered into a voting agreement to vote in favor of the transaction at the special meeting of Knoll shareholders to be held in connection with the transaction.

This highly complementary combination will create the preeminent leader in modern design, catalyzing the transformation of the home and office sectors at a time of unprecedented disruption. Herman Miller and Knoll collectively have 19 leading brands, presence across over 100 countries worldwide, a global dealer network, 64 showrooms globally, more than 50 physical retail locations and global multi-channel eCommerce capabilities. The combined company will have pro forma annual revenue of approximately $3.6 billion and pro forma adjusted EBITDA of approximately $552 million, based on each company's respective last reported 12 months and including the anticipated $100 million of cost synergies, implying adjusted EBITDA margins of approximately 16%.

*     *     *

Following the close of the transaction, Ms. Owen will serve as President and Chief Executive Officer of the combined company. Mr. Cogan plans to depart the combined company upon closing of the transaction after a successful 30-year career with Knoll, during which time Knoll received the National Design Award for Corporate and Institutional Achievement from the Smithsonian's Cooper-Hewitt, National Design Museum.

Commenting on Mr. Cogan's leadership, Ms. Owen concluded, "I want to thank Andrew for his partnership in reaching this agreement and recognize his outstanding dedication to Knoll during its many years of success. Knoll thrives today as a result of Andrew's dedication to its founders' commitment to good design. In the process, he has built an organization and brand portfolio dedicated to design leadership, operational excellence, digital innovation and customer experience, building on the storied Knoll heritage and pioneering the development of groundbreaking products. We look forward to welcoming Knoll's incredibly talented team."

**Approvals, Financing and Timing to Close**

The transaction, which is expected to close by the end of the third quarter of calendar year 2021, is subject to approval by Herman Miller and Knoll shareholders, the receipt of required regulatory approvals and the satisfaction of other customary closing conditions.

The transaction is not conditioned on financing. Herman Miller expects to fund the cash portion of the transaction consideration with a combination of new debt and cash on hand. Herman Miller has obtained a commitment from Goldman Sachs for $1.75^1$ billion of senior secured revolving and term loan credit facilities, subject to customary conditions.

**Advisors**

Goldman Sachs & Co. LLC is serving as financial advisor to Herman Miller and Wachtell, Lipton, Rosen & Katz is serving as legal advisor. BofA Securities is serving as financial advisor to Knoll and Sullivan & Cromwell is serving as legal advisor.

22. On May 24, 2021, Defendants caused to be filed with the SEC a Form S-4 Registration Statement (the "Registration Statement") under the Securities Act of 1933 in connection with the Proposed Transaction.

### B. The Registration Statement Contains Materially False and Misleading Statements and Omissions

23. The Registration Statement, which recommends that Knoll shareholders vote in favor of the Proposed Transaction, omits and/or misrepresents material information concerning: (i) Knoll's and Herman Miller's financial projections; (ii) the financial analyses performed by Knoll's financial advisor, BofA Securities, Inc. ("BofA"), in connection with its fairness opinion; (iii) the sales process leading up to the Proposed Transaction; and (iv) potential conflicts of interest involving BofA.

24. The omission of the material information (referenced below) renders the following sections of the Registration Statement false and misleading, among others: (i) Knoll Board's Recommendation and Reasons for the Merger; (ii) Opinion of BofA Securities, Knoll's Financial Advisor; (iii) Certain Unaudited Prospective Financial Information; and (iv) Background of the Transactions.

25. Unless and until the material misstatements and omissions (referenced below) are remedied before the anticipated shareholder vote on the Proposed Transaction, Knoll shareholders

will be forced to make a voting decision on the Proposed Transaction without full disclosure of all material information. In the event the Proposed Transaction is consummated, Plaintiff may seek to recover damages resulting from Defendants' misconduct.

### 1. Material Omissions Concerning Knoll's and Herman Miller's Financial Projections

26. The Registration Statement omits material information concerning Knoll's and Herman Miller's financial projections.

27. With respect to the Herman Miller forecasts, the Registration Statement fails to disclose: (1) all line items underlying (i) Net sales, and (ii) Adjusted EBITDA; and (2) a reconciliation of all non-GAAP to GAAP financial metrics.

28. With respect to the unlevered free cash flows for Herman Miller for fiscal years ending 2021 through 2026 and calendar years ending 2021 through 2025, as calculated by Herman Miller management and Knoll management, respectively, based on certain information in the Herman Miller forecasts, the Registration Statement fails to disclose all line items underlying the unlevered free cash flows and a reconciliation of all non-GAAP to GAAP financial metrics.

29. With respect to the Knoll forecasts, the Registration Statement fails to disclose: (1) all line items underlying (i) Sales, and (ii) Adjusted EBITDA; and (2) a reconciliation of all non-GAAP to GAAP financial metrics.

30. With respect to Knoll's fiscal year ending 2021 financial projections approved by Herman Miller management following additional due diligence subsequent to being provided the Knoll forecasts, the Registration Statement fails to disclose: (1) all line items underlying (i) Sales, and (ii) Adjusted EBITDA; and (2) a reconciliation of all non-GAAP to GAAP financial metrics

31. With respect to the unlevered free cash flows for Knoll for fiscal years ending 2021 through 2025, as calculated separately by Knoll management and Herman Miller management,

based on certain information in the Knoll forecasts, the Registration Statement fails to disclose all line items underlying the unlevered free cash flows and a reconciliation of all non-GAAP to GAAP financial metrics.

32.   The Registration Statement further fails to provide a fair summary of the street forecasts for Herman Miller that were reviewed by the Board during the sales process.

33.   When a company discloses non-GAAP financial metrics in a Registration Statement, the company must also disclose all projections and information necessary to make the non-GAAP metrics not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial metrics disclosed or released with the most comparable financial metrics calculated and presented in accordance with GAAP. The SEC has increased its scrutiny of a company's use of non-GAAP financial measures as such measures can be misleading and "crowd out" more reliable GAAP information.[1]

34.   The disclosure of this information is material because it would provide the Company's shareholders with a basis to project the future financial performance of the Company and combined company and would allow shareholders to better understand the financial analyses performed by the Company's financial advisors in support of their fairness opinions. Shareholders cannot hope to replicate management's inside view of the future prospects of the Company. Without such information, which is uniquely possessed by Defendant(s) and the Company's

---

[1] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html (footnotes omitted) (last visited June 8, 2021) ("And last month, the staff issued guidance addressing a number of troublesome practices which can make non-GAAP disclosures misleading: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.").

financial advisors, the Company's shareholders are unable to determine how much weight, if any, to place on the Company's financial advisors' fairness opinions in determining whether to vote for or against the Proposed Transaction.

35. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

### 2. Material Omissions Concerning BofA's Financial Analyses

36. In connection with the Proposed Transaction, the Registration Statement omits material information concerning analyses performed by BofA.

37. With respect to BofA's "*Selected Precedent Transactions Analysis*," the Registration Statement fails to disclose: (1) the closing dates of each transaction; (2) the values of each transaction, which BofA stated it had reviewed in connection with its analysis; and (3) BofA's basis for applying a TV/LTM EBITDA multiple reference range of 10.5x to 15.0x to Knoll management's estimate of Knoll's LTM Adjusted EBITDA as of March 31, 2021.

38. The Registration Statement fails to disclose the following concerning BofA's "*Discounted Cash Flow Analysis*" of Knoll: (1) all line items underlying the standalone unlevered, after-tax free cash flows that Knoll was expected to generate over the period from December 31, 2020 through December 31, 2025; (2) the terminal values for Knoll; (3) the individual inputs and assumptions underlying the (i) perpetuity growth rates of 2.00% to 2.50%, and (ii) discount rates ranging from 7.50% to 9.75%; (4) Knoll's net debt as of December 31, 2020; and (5) the number of fully-diluted shares of Knoll common stock outstanding. The disclosure of this information is even more material in light of the fact that BofA's analysis resulted in an implied equity value reference range of $14.75 to $25.75 per share of Knoll common stock against an implied merger consideration value of $25.18 at the upper limits of the reference range.

39. With respect to BofA's "*Selected Publicly Traded Companies Analysis*" for Knoll,

9

the Registration Statement fails to disclose: (1) stock-based compensation expense; (2) BofA's basis for applying a multiple reference range of 8.0x to 13.5x to Knoll management's estimated calendar year 2021E Adjusted EBITDA and a multiple reference range of 7.5x to 10.5x to Knoll management's estimated calendar year 2022E Adjusted EBITDA; (3) BofA's basis for applying a 2021E Price/EPS multiple reference range of 20.0x to 30.0x to Knoll management's estimates of calendar year 2021E Adjusted Diluted EPS and a 2022E Price/EPS multiple reference range of 15.0x to 25.0x to Knoll management's estimated calendar year 2022E Adjusted Diluted EPS; (4) Knoll's net debt as of December 31, 2020; and (5) the number of fully-diluted shares of Knoll common stock outstanding.

40.     With respect to BofA's "*Wall Street Analysts Price Targets*" analysis of Knoll, the Registration Statement fails to disclose: (1) the individual analyst price targets observed by BofA in its analysis; and (2) the sources thereof.

41.     With respect to BofA's "*Selected Publicly Traded Companies Analysis*" for Herman Miller, the Registration Statement fails to disclose: (1) stock-based compensation expense; (2) BofA's basis for applying a multiple reference range of 8.0x to 13.5x to Herman Miller management's estimated calendar year 2021E Adjusted EBITDA and a multiple reference range of 7.5x to 10.5x to Herman Miller management's estimated calendar year 2022E Adjusted EBITDA; (3) BofA's basis for applying a 2021E Price/EPS multiple reference range of 20.0x to 30.0x to the estimates of calendar year 2021E Adjusted EPS and a 2022E Price/EPS multiple reference range of 15.0x to 25.0x to the estimates of calendar year 2022E Adjusted EPS; and (4) Herman Miller's net debt as of December 31, 2020.

42.     The Registration Statement fails to disclose the following concerning BofA's "*Discounted Cash Flow Analysis*" of Herman Miller: (1) all line items underlying the standalone

unlevered, after-tax free cash flows Herman Miller was expected to generate over the period from December 31, 2020 through December 31, 2025; (2) the terminal values for Herman Miller; and (3) the individual inputs and assumptions underlying the (i) perpetuity growth rates of 2.00% to 2.50%, and (ii) discount rates ranging from 8.25% to 10.75%; (4) Herman Miller's net debt as of December 31, 2020; and (5) the number of fully-diluted shares of Herman Miller common stock outstanding.

43. With respect to BofA's "*Wall Street Analysts Price Targets*" analysis of Herman Miller, the Registration Statement fails to disclose: (1) the individual analyst price targets observed by BofA in its analysis; and (2) the sources thereof.

44. The Registration Statement fails to disclose the following concerning BofA's "*Has/Gets Analysis*": (1) the inputs and assumptions underlying (i) the use of the perpetuity growth rate of 0% to the estimated after-tax cost savings in the terminal year, (ii) the discount rate range of 8.25% to 10.75% to the estimated cost savings; (2) the cost to achieve the cost savings and cash taxes thereon; (3) the additional amount of debt expected to be incurred by Herman Miller in connection with the Proposed Transaction; and (4) the estimated number of fully diluted shares of Herman Miller common stock expected to be outstanding after giving effect to the Proposed Transaction.

45. The valuation methods, underlying assumptions, and key inputs used by BofA in rendering its purported fairness opinion must be fairly disclosed to Knoll shareholders. The description of BofA's fairness opinion and analyses, however, fails to include key inputs and assumptions underlying those analyses. Without the information described above, Knoll shareholders are unable to fully understand BofA's fairness opinion and analyses, and are thus unable to determine how much weight, if any, to place on them in determining whether to vote for

or against the Proposed Transaction.

46. This omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

### 3. Material Omissions Concerning the Sales Process Leading up to the Proposed Transaction

47. The Registration Statement omits material information concerning the sales process leading up to the Proposed Transaction.

48. In 2019, Investindustrial and another financial sponsor ("Sponsor A") submitted a written proposal to acquire Knoll through a jointly controlled entity ("Company A") in an all-cash transaction. Knoll made a non-binding counterproposal to Investindustrial and Sponsor A for Knoll to instead acquire Company A in an all-stock transaction. Investindustrial and Sponsor A rejected Knoll's counterproposal. The parties continued discussions, resulting in two further written proposals from Investindustrial and Sponsor A for the acquisition of Knoll by Company A in an all-cash transaction. The Board determined to move forward with negotiations until it learned that Sponsor A had not obtained internal approval with respect to the second revised proposal to Knoll. In April 2019, the Board terminated discussions with Investindustrial and Sponsor A with respect to a transaction with Company A.

49. In March 2020, at the outset of the COVID-19 pandemic, the Board began considering various financial scenarios.

50. In April 2020, Investindustrial informed Knoll that it had purchased approximately 4% of the outstanding shares of Knoll common stock, that it "continued to believe in Knoll's strategy[,]" and had interest in serving as a source of financing for Knoll if the need were to arise.

51. On June 22, 2020, Knoll entered into an investment agreement with Investindustrial pursuant to which Knoll issued and sold to Investindustrial 164,000 shares of Knoll's Series A

Convertible Preferred Stock, par value $1.00 per share ("Knoll preferred stock") for an aggregate purchase price of $164 million. The Board believed this investment "fortified Knoll's balance sheet and enhanced Knoll's ability to continue to execute its strategic plan in the face of an uncertain macroeconomic environment, and also explore future strategic opportunities should they arise." Pursuant to the terms of the investment agreement, Knoll increased the size of its Board allowing Investindustrial to designate an individual (Roberto Ardagna) to fill the vacancy. On July 21, 2020, the sale of Knoll preferred stock to Investindustrial closed.

52.     On March 26, 2021, "Knoll entered into a confidentiality agreement with Investindustrial in order to engage in more detailed discussions regarding Investindustrial's potential interest in an acquisition of Knoll or, alternatively, its willingness to support the potential transaction being considered by the Knoll Board."

53.     On April 5, 2021, the Board learned that "Investindustrial had completed an analysis of an acquisition of Knoll, but concluded that it would be unable to make a competitive offer in light of the Herman Miller proposal."

54.     Concurrent with the execution of the merger agreement, Furniture Investments Acquisitions S.C.S., an Investindustrial entity, entered into a voting and support agreement (the "Voting Agreement"), with Herman Miller, pursuant to which, among other things, and subject to the terms and conditions of the Voting Agreement, Investindustrial agreed to vote all of the shares of Knoll preferred stock beneficially owned by it, and any shares of Knoll common stock beneficially owned by it at the time of the Knoll special meeting, in favor of the Knoll merger

proposal.[2] According to the Registration Statement, the Voting Agreement terminates upon certain events, including a Knoll recommendation change and the termination of the merger agreement in accordance with its terms. As of May 18, 2021, Investindustrial owned approximately 16.57% of the total voting power of the holders of Knoll capital stock voting as a single class.

55. Given Investindustrial's investment history and interest in acquiring Knoll, the Proxy Statement must disclose the terms of Knoll's confidentiality agreement with Investindustrial, including whether such agreement contained standstill provisions with "don't ask, don't waive" (DADW) provisions (including their time of enforcement) that could preclude it from making a superior offer for the Company at some point.

56. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

### 4. Material Omissions Concerning BofA's Potential Conflicts of Interest

57. The Registration Statement omits material information concerning potential conflicts of interest involving BofA.

58. The Registration Statement provides that BofA and its affiliates derived approximately $7.5 million in aggregate revenue from Knoll and certain of its affiliates for providing corporate and/or investment banking services from April 1, 2019 through March 31, 2021, stating in relevant part:

> BofA Securities and its affiliates in the past have provided, currently are providing, and in the future may provide, investment banking, commercial banking and other financial services to Knoll and have received or in the future may receive

---

[2] According to the Registration Statement, Herman Miller entered into a preferred stock purchase agreement and Voting Agreement with Furniture Investments Acquisitions S.C.S.. The preferred stock purchase agreement provides that Herman Miller will acquire all outstanding shares of Knoll preferred stock from Investindustrial for approximately $253 million in cash. The Voting Agreement provides, among other things, that Investindustrial will vote the shares of Knoll preferred stock in favor of the Knoll merger proposal. *See* Registration Statement at 2.

14

> compensation for the rendering of these services, including (i) having acted as capital markets advisor to Knoll in connection with a private placement of convertible debt securities, (ii) having acted or acting as administrative agent, co-lead arranger and joint-bookrunner for, and as a lender (including a swing line and letter of credit lender) to Knoll, and (iii) having provided or providing certain foreign exchange trading and treasury management services to Knoll. From April 1, 2019 through March 31, 2021, BofA Securities and its affiliates derived aggregate revenues from Knoll and certain of its affiliates of approximately $7.5 million for corporate and/or investment banking services.

Registration Statement at 91.

59. The Registration Statement, however, fails to disclose: (1) whether and to what extent BofA provided services to and/or received compensation from Investindustrial, Furniture Investments Acquisitions S.C.S., and their affiliates, within the past two years of the date of BofA's fairness opinion; (2) the amount of compensation BofA and its affiliates received from Knoll and its affiliates from April 19, 2019 through April 19, 2021 (not March 31, 2021), which is the past two years of the date of BofA's fairness opinion; and (3) whether the $7.5 million in revenue that BofA derived from Knoll and its affiliates for "corporate and/or investment banking services" includes revenue for providing the services listed in subsections (i), (ii), and (iii) in Paragraph 58 above, including commercial banking services.

60. The Registration Statement provides that BofA and its affiliates derived approximately $1.3 million in aggregate revenue from Herman Miller for providing corporate and/or investment banking services from April 1, 2019 through March 31, 2021, stating in relevant part:

> In addition, BofA Securities and its affiliates in the past have provided, currently are providing, and in the future may provide, investment banking, commercial banking and other financial services to Herman Miller and have received or in the future may receive compensation for the rendering of these services, including (i) having acted or acting as lender under Herman Miller's revolving credit facility and (ii) having provided or providing certain foreign exchange trading and treasury management services to Herman Miller. From April 1, 2019, through March 31, 2021, BofA Securities and its affiliates derived aggregate revenues from Herman

Miller of approximately $1.3 million for corporate and/or investment banking services.

Registration Statement at 91.

61. The Registration Statement, however, fails to disclose: (1) the amount of compensation BofA and its affiliates received from Herman Miller and its affiliates from April 19, 2019 through April 19, 2021 (not March 31, 2021), which is the past two years of the date of BofA's fairness opinion; and (2) whether the $1.3 million in revenue that BofA derived from Herman Miller for "corporate and/or investment banking services" includes revenue for providing the services listed in subsections (i) and (ii) in Paragraph 60 above, including commercial banking services.

62. Disclosure of a financial advisor's compensation and potential conflicts of interest is necessary due to their central role in the evaluation, exploration, selection, and implementation of strategic alternatives and the rendering of any fairness opinions. Disclosure of a financial advisor's potential conflicts of interest may inform shareholders on how much weight to place on that analysis.

63. The omission of the above-referenced information renders the Registration Statement materially incomplete and misleading. This information, if disclosed, would significantly alter the total mix of information available to Knoll shareholders.

## COUNT I
### For Violations of Section 14(a) and Rule 14a-9 Promulgated Thereunder
### Against All Defendants

64. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

65. During the relevant period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and misleading Registration Statement specified

above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC.

66. Each of the Individual Defendants, by virtue of his/her positions within the Company as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a) of the Exchange Act. Defendants, by use of the mails and means and instrumentalities of interstate commerce, solicited and/or permitted the use of their names to file and disseminate the Registration Statement with respect to the Proposed Transaction. The Defendants were, at minimum, negligent in filing the materially false and misleading Registration Statement.

67. The false and misleading statements and omissions in the Registration Statement are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.

68. By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

69. Because of the false and misleading statements and omissions in the Registration Statement, Plaintiff is threatened with irreparable harm.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

70. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

71. The Individual Defendants acted as control persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their senior positions

as officers and/or directors of the Company and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Registration Statement filed with the SEC, they had the power to and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading Registration Statement.

72. Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Registration Statement, and to correct promptly any public statements issued by the Company which were or had become materially false or misleading.

73. In particular, each of the Individual Defendants had direct and supervisory involvement in the operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Individual Defendants were provided with or had unlimited access to copies of the Registration Statement and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. The Registration Statement at issue contains the recommendation of the Individual Defendants to approve the Proposed Transaction. Thus, the Individual Defendants were directly involved in the making of the Registration Statement.

74. In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Registration Statement purports to describe the various issues and

information that they reviewed and considered—descriptions which had input from the Individual Defendants.

75. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

76. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' conduct, the Company's shareholders will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until Defendants disclose and disseminate the material information identified above to Company shareholders;

B. In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C. Declaring that Defendants violated Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder;

D. Awarding Plaintiff reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E. Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: June 8, 2021

Respectfully submitted,

**HALPER SADEH LLP**

/s/ Zachary Halper
Zachary Halper, Esq.
186 Darwin Lane
North Brunswick, NJ 08902
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: zhalper@halpersadeh.com

Daniel Sadeh, Esq. (*pro hac vice* application forthcoming)
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600

*Counsel for Plaintiff*